**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

PERRONE ROBOTICS, INC. AND PERRONE ROBOTICS INNOVATIONS, LLC,

*Plaintiffs,*

v.

TESLA, INC.,

*Defendant.*

Civil Action No. 3:25cv974

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC file this Complaint for patent infringement against Defendant Tesla, Inc. ("Tesla") for infringing U.S. Patent Nos. 12,181,877; 11,782,442; 11,314,251; 9,833,901; and 9,195,233 (collectively, the "Patents-in-Suit") and allege as follows:

## PARTIES

1. Perrone Robotics, Inc. is a stock corporation organized and existing under the laws of Delaware, with its principal place of business located at 1000 Research Park Boulevard, Suite 106, Charlottesville, Virginia 22911. Perrone Robotics, Inc. owns 100% of the equity interests of Perrone Robotics Innovations, LLC.

2. Perrone Robotics Innovations, LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at 1000 Research Park Boulevard, Suite 106, Charlottesville, Virginia 22911. Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC (collectively, "Perrone Robotics") own all right, title, and interest in

the Patents-in-Suit, including the right to assert all causes of action under the Patents-in-Suit and the right to any remedies for the infringement of the Patents-in-Suit.

3. Tesla, Inc. is a corporation organized and existing under the laws of Texas with its principal place of business at 1 Tesla Rd., Austin, Texas 78725-4400. Tesla designs, manufactures, markets, distributes and sells Tesla brand automobiles in the United States, including in Virginia and this District. Tesla may be served through its registered agent for process, CT Corporation System, 4701 Cox Rd Ste 285, Glen Allen, Virginia 23060-6808.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

5. This Court has personal jurisdiction over Tesla because Tesla has had minimum contacts with Virginia such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. In particular, Tesla has committed acts of infringement in violation of 35 U.S.C. § 271 in this District and has placed Infringing Products[1] into the stream of commerce, through an established distribution channel, with the knowledge and/or understanding that such products will be used and sold in Virginia and this District. These acts caused and continue to cause injury to Perrone Robotics within Virginia and this District. Tesla derives substantial resources from the sale of Infringing Products distributed within Virginia and this District, derives substantial revenue from interstate and international commerce, and expects or should reasonably expect its actions to have consequences within Virginia and this District.

6. Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

[1] Exhibit F contains a preliminary list of Tesla's "Infringing Products," which Perrone Robotics will update and revise based on discovery in this case.

7. Tesla has committed acts of infringement in this District by making, using, offering for sale, selling, and/or importing products or services that infringe the Patents-in-Suit, or by inducing others to infringe the Patents-in-Suit. Tesla has regular and established places of business in this District. By way of example, Tesla has showrooms and stores in the District and offers for sale infringing vehicles at numerous locations in this District. As an example, Tesla has a showroom at 2710 S Glebe Rd, Arlington, Virginia 22206 and at 8500 Tyco Rd, Vienna, Virginia 22182. On information and belief, Tesla sought and obtained an exemption from the Virginia DMV that allowed it to engage in direct vehicle sales in Virginia, including in this District, rather than having to sell its vehicles through a dealership, and since that time it has directly sold its vehicles in Virginia and this District.

8. Tesla is registered to do business in Virginia. Its registered agent is CT Corporation System, 4701 Cox Rd Ste 285, Glen Allen, Virginia 23060-6808.

9. Tesla derives benefits from its presence in this federal judicial District, including, but not limited to, sales revenue from the sale of Tesla vehicles in this district.

## THE PATENTS-IN-SUIT

10. On December 31, 2024, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 12,181,877 ("the '877 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '877 Patent. A copy of the '877 Patent is attached as Exhibit A.

11. On October 10, 2023, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,782,442 ("the '442 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics,

Inc. Perrone Robotics owns and holds all rights, title and interest in and to the ’442 Patent. A copy of the ’442 Patent is attached as Exhibit B.

12. On April 26, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,314,251 (“the ’251 Patent”) titled “General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions” to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the ’251 Patent. A copy of the ’251 Patent is attached as Exhibit C.

13. On December 5, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,833,901 (“the ’901 Patent”) titled “General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions” to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the ’901 Patent. A copy of the ’901 Patent is attached as Exhibit D.

14. On November 24, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,195,233 (“the ’233 Patent”), titled “General Purpose Robotics Operating System” to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the ’233 Patent. A copy of the ’233 Patent is attached as Exhibit E.

## FACTUAL ALLEGATIONS

***Perrone Robotics’ Technology***

15. Paul Perrone, the founder and CEO of Perrone Robotics, Inc., is a computer engineer and pioneer in the automated driving space. Perrone is the sole inventor of each of the Patents-in-Suit.

16. In 2003, Perrone and his company Perrone Robotics, Inc. began working on automated devices and robots. The problem he identified was that every time a manufacturer

wanted to make a robot or automated device, the manufacturer started from scratch and created specific hardware and software for the specific robot or automated device. This was inefficient and inhibited the ability to mass produce robots and automated devices.

17. To solve this problem, Perrone came up with the novel idea of a general purpose robotics operating system ("GPROS") with application services that could be used across robots and automated devices and that could be configured to the specific robot or automated device. Today, such GPROSs are in existence, but at the time of Perrone's invention, they were unheard of. Perrone's invention of a GPROS with configurable applications is embodied in Perrone Robotics, Inc.'s full-stack robotic and automated software platform, MAX.

18. In 2005, Perrone Robotics, Inc. entered the DARPA Grand Challenge, a race across the Mojave desert with a $2 million prize for anyone who could build a driverless vehicle that could complete the 100+ mile desert journey. Perrone Robotics, Inc.'s vehicle, Tommy, was one of the small number of applicants accepted as a semifinalist to enter the race. Tommy relied on Perrone Robotics, Inc.'s MAX platform. Perrone's understanding of the state of the industry was reinforced as he observed during the 2005 DARPA Grand Challenge that the other entrants were building specific hardware and software for the specific vehicle and that they were not relying on a GPROS that could be used across multiple vehicles.

19. In February 2006, Perrone Robotics, Inc. filed for what became the '233 Patent to protect its foundational intellectual property related to using a GPROS in robots and automated devices, as embodied in Perrone Robotics, Inc.'s software platform, MAX. Perrone Robotics, Inc. subsequently filed the other four Patents-in-Suit.

20. The inventions claimed in the Patents-in-Suit represent a significant technological advancement over the prior art robotics architectures. Previously, when someone wanted to build

a robot or automated device, they had to create specific hardware and software for the robot or automated device. These rigid, vertically integrated control systems where application software was tied to specific hardware configurations were inefficient and prevented widespread deployment of robotic and automated devices. This conventional approach generally required developers to write custom, hardware-specific code for every new sensor, actuator, or mobility platform, or hard-coded configurations, algorithms, and behaviors, creating a technical barrier to interoperability and scalability. The Patents-in-Suit solve this specific computing problem through the non-conventional architecture of the GPROS, which introduces a novel layer of generic abstractions and dynamic configuration services that were neither well-understood nor routine in the field. The resulting GPROS could be deployed across different robots and automated devices and used with different sensors and hardware, with varying communication protocols, and with configurable algorithms for robotics and automation control. The solution of using a GPROS was not well-understood, routine, or conventional at the time of the invention.

21. The Patents-in-Suit also solved a significant technological problem in the prior art by describing application services that are "(i) completely configurable by using a config service, (ii) can be adapted both statically and dynamically, and (iii) provides access to configuration data using a generic abstraction." '233 Pat. Col. 41 ll. 53–57. The configurability of the application services and the ability to access configuration data were critical to solving the problem of being able to deploy the GPROS across different devices and with different sensors and hardware. The concepts set forth in this claim element were not well-understood, routine, or conventional at the time of the invention in the field of robotics and automation. Similarly, application services that can be "adapted both statically and dynamically" represent an important technological leap forward. This dual-mode adaptability is not merely a refinement of conventional configuration

techniques; it represents a sophisticated solution to the technical problem of allowing modifications to robotic and automated systems. This sophisticated level of adaptability, operating in concert with a GPROS, was not well-understood or routine in the robotics field at the time of invention, particularly not as a deployable feature applicable across multiple hardware platforms.

22. The claim elements of the Patents-in-Suit related to a GPROS with configurable application services, separately, and in combination with the other claim elements, solved the problem that existed in the prior art that to create a robot or automated device, a manufacturer had to create hardware and software for the specific device. This solution was not well-understood, routine, or conventional at the time. Since the invention, automakers have relied on the patented technology to facilitate deployment of fleets of automated vehicles, which was not possible and was not done before the invention of the Patents-in-Suit.

23. The Patents-in-Suit, which generally describe a GPROS to manage an autonomous vehicle service, also address the significant problem in the prior art of needing to build specific hardware and software for each vehicle. The Patents-in-Suit generally describe a method of using a GPROS with configurable application services and other claim elements to achieve an autonomous vehicle service or autonomous movement planning service. These concepts were not previously well-understood, routine, or conventional in the field of robotics and automation.

24. The invention of the Patents-in-Suit also provides a technical solution to the long-standing robotics challenge of hardware heterogeneity through a hardware-independent abstraction layer that manages services across disparate platforms. Notably, the Patents-in-Suit do not simply provide static hardware abstraction; rather, they integrate "a service to manage synchronous, asynchronous, and real time application threads." This inventive thread management

system solves a concrete technical problem inherent to robotics: the need to coordinate sensor processing, decision-making, and actuator control across hardware platforms.

25. The Patents-in-Suit also disclose a fusion service that implements an unconventional solution to the technical problem of integrating multiple sensors in real-time systems. This approach was not well-understood, routine, or conventional because it achieves hardware independence while maintaining the tight timing requirements of real-time vehicle control—a technical problem that prior-art systems solved through hardware-specific, non-portable implementations rather than through the disclosed invention.

26. The Patents-in-Suit also claim updating a set of application services with downloaded software from a network, enabling modification of control logic without physical intervention. This capability represents a non-routine and non-conventional technical achievement in safety-critical systems. Traditional control systems employ tightly integrated, statically-compiled firmware that requires factory recalls, service center visits, and extensive re-certification for modifications—particularly for safety-critical functions like steering, braking, and throttle control. The claimed ability to push application service updates, including over-the-air, while preserving the integrity of real-time thread management, maintaining hardware platform independence, and ensuring coordinated multi-actuator control represents a fundamentally different and non-conventional approach. This dynamic reconfiguration capability enables in certain embodiments, rapid deployment of new algorithms, updated sensor parameters, modified planning logic, and corrected control behaviors—a technical advance that was not well-understood or routine in the automated vehicle industry.

27. The Patents-in-Suit also claim a GPROS comprising a suite of configurable application services to enable composition of rich and complex robotic and automation

applications with peripherals such as sensors and actuators in a hardware independent fashion. GPROSs specifically addressed the shortcomings of the prior art and provided a path and means for creating rich and complex robotics and automation applications. The prior art generally relied upon hard-coded configurations, brittle and non-configurable algorithms and behaviors, and hard-coded binding to specific sensors and actuation methods, which prevented the complex robotics and automation applications that GPROSs facilitated.

***Tesla's Infringement***

28. Much has changed since 2006 when Perrone Robotics Inc. filed its original patent application, which became the '233 Patent. Consumer demand and regulatory agencies have pushed automakers like Tesla to provide more automated features in their vehicles, which, among other benefits, increase safety and driver convenience. For instance, in May 2024, the National Highway Traffic Safety Administration finalized a rule that would require auto manufacturers to include automatic emergency braking in all their new cars and light trucks by 2029.

29. To facilitate deployment of automated vehicle features across their fleets, automakers like Tesla rely on the use of a GPROS with configurable applications, the very technology that is described in Perrone Robotics' foundational patents. On information and belief, Tesla has relied on an in-house GPROS, including one called Tesla OS.[2]

30. Tesla offers its automated vehicle features through Tesla Autopilot,[3] which Tesla promotes on its website as an "advanced driver assistance system that helps enhance safety and

---

[2] https://medium.com/the-tesla-digest/exploring-teslas-operating-system-a-look-into-the-tech-behind-the-wheels-b601a932fc2c

[3] On information and belief, during the past six years, all vehicles using any Autopilot version infringe the Patents-in-Suit, which on information and belief include Autopilot 2 and Autopilot 3. In this Complaint, references to "Autopilot" refer to all versions of Autopilot implemented in vehicles made, sold, used, imported, and/or offered for sale in vehicles during the past six years.

convenience."[4] Tesla has offered Autopilot in different forms in most of the vehicles it has sold since 2014.[5]

31. Tesla Autopilot includes numerous Advanced Driver-Assistance System ("ADAS") driving features including automatic emergency braking, which "detects cars or obstacles that the vehicle may impact and applies the brakes"; forward collision warning, which "warns of impending collisions with slower moving or stationary vehicles in front of your Tesla vehicle"; and lane departure avoidance, which "applies corrective steering to keep your vehicle in your current lane."[6] Autopilot also includes "traffic-aware cruise control," which "maintains a set driving speed and slows down or accelerates as needed to maintain the following distance from the vehicle in front of you," and "Autosteer," which "maintains a set speed if there is not a vehicle in front of you or a set following distance if there is a vehicle in front of you and your vehicle detects lane markings, road edges and the presence of vehicles and objects to intelligently keep your vehicle in its driving lane."[7]

32. Tesla also offers ADAS vehicle features through its "Full Self-Driving (Supervised)" application.[8] Tesla promotes its Full Self-Driving (Supervised) application

---

The specific descriptions of Autopilot below are exemplary and may not apply to all versions of Autopilot. The Infringing Products (identified preliminarily in Exhibit F) have varying option levels for Autopilot.

[4] https://www.tesla.com/support/autopilot

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] https://www.tesla.com/fsd. On information and belief, during the past six years, all vehicles using any version of Full Self-Driving (Supervised) infringe the Patents-in-Suit. In this Complaint, references to "Full Self-Driving (Supervised)" refer to all versions of Full Self-Driving (Supervised) implemented in vehicles made, sold, used, imported, and/or offered for sale during the past six years. The specific descriptions of Full Self-Driving (Supervised) below are exemplary

prominently on its website and features a video of a vehicle navigating obstacles such as pedestrian crossings and bicycles, as well as difficult driving situations like sharp turns on a cliff and a rain storm, all while the driver sits and watches with his hands off the wheel.




33. Tesla describes Full-Self Driving (Supervised) as a program that "intelligently and accurately completes driving maneuvers for you, including route navigation, steering, lane changes, parking and more under your active supervision" and encourages drivers to "use it for quick errands, daily commutes and road trips."[9]

34. Tesla also promotes that Full Self-Driving (Supervised) "Drives for you."[10]




---

and may not apply to all versions of Full Self-Driving (Supervised). The Infringing Products (identified preliminarily in Exhibit F) have varying option levels for Full Self-Driving (Supervised).

[9] *Id.*

[10] *Id.*

**COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 12,181,877**

35. Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

36. On December 31, 2024, the United States Patent and Trademark Office duly and legally issued the ’877 Patent titled “General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions” to Perrone Robotics, Inc. A copy of the ’877 Patent is attached as Exhibit A.

37. The ’877 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

38. Perrone Robotics owns all rights, title, and interest in and to the ’877 Patent, including the right to assert all causes of action under the ’877 Patent and the right to any remedies for the infringement of the ’877 Patent.

39. The ’877 Patent is generally directed to a vehicle which includes a novel GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

40. Tesla has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’877 Patent, including at least claims 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21, in violation of 35 U.S.C. § 271(a) by its manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include Tesla Autopilot. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the ’877 Patent literally or under the doctrine of equivalents.

41. For example, claim 1 of the ’877 Patent recites:

1. A vehicle comprising:

a steering mechanism, a brake, and a throttle;

an operating system comprising a set of application services configured to manage at least one obstacle service of the vehicle, the vehicle configured to use a movement plan, wherein the set of application services is independent of an underlying hardware platform and is configurable to perform at least one communication task and at least one operational task, wherein the set of application services:

is configurable using a configuration service,

is configurable to be adapted both statically and dynamically, and

is configurable to access configuration data using a generic abstraction; and

a graphical user interface,

wherein the vehicle is adapted to receive the configuration data over a network, and

wherein the vehicle is adapted to avoid obstacles.

42. By way of a non-limiting example, Tesla's vehicles such as the Tesla Model Y comprise vehicles, as required by claim 1. Until Tesla unveiled its more affordable Model Y in late 2025, all Tesla Model Ys included Tesla Autopilot.

43. Tesla's vehicles such as the Model Y include a steering mechanism, a brake, and a throttle, as required by claim 1. By way of example, Autosteer relies on a steering mechanism to keep the vehicle centered in the lane. As a further example, Tesla's traffic-aware cruise control relies on a brake and throttle to increase or decrease speed.

44. Vehicles with Tesla Autopilot practice an operating system comprising a set of application services configured to manage at least one obstacle service of the vehicle, as required by claim 1. On information and belief, vehicles with Autopilot have relied on an in-house GPROS, including one called Tesla OS. Vehicles with Tesla Autopilot include a set of application services that manages at least one obstacle service of the vehicle, including automatic emergency braking, which detects cars or obstacles that the vehicle may impact and applies the brakes.

45. Tesla's vehicles equipped with Tesla Autopilot, including the Tesla Model Y, are configured to use a movement plan, as required by claim 1. By way of example, vehicles with Tesla Autopilot utilize a movement plan when they use Autosteer to move the steering wheel to keep the vehicle centered in a lane based on a movement plan.

46. Vehicles with Tesla Autopilot practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one communication task and at least one operational task, as required by claim 1. By way of example, Tesla Autopilot is independent of the underlying platform and can be used across Tesla models, including the Tesla Model Y. Vehicles with Tesla Autopilot perform operational tasks, including traffic-aware cruise control and Autosteer. Vehicles with Tesla Autopilot perform communication tasks such as communication with the sensors and over-the-air software updates.

47. Vehicles with Tesla Autopilot practice a set of application services that is configurable using a configuration service, is configurable to be adapted both statically and dynamically, and that is configurable to access configuration data using a generic abstraction, and that has a graphical user interface, as required by claim 1. By way of example, Tesla Autopilot allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. Tesla Autopilot calibration is performed both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

48. Tesla's vehicles equipped with Tesla Autopilot, including the Model Y, are adapted to receive configuration data over a network, as required by claim 1. By way of example, Tesla Autopilot includes an over-the-air software update.

49. Tesla's vehicles equipped with Tesla Autopilot, including the Model Y, are adapted to avoid obstacles. By way of example, vehicles with Tesla Autopilot include automatic emergency braking, which detects cars or obstacles that the vehicle may impact and applies the brakes.

50. For the reasons discussed above as well as throughout in the context of other patent claims, Tesla's vehicles with Tesla Autopilot also infringe claims 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 3 because they have a neural network or rules engine technology. For example, Tesla vehicles with Autopilot and Full Self-Driving (Supervised) incorporate neural network technology.[11] Further, as another example, Tesla Autopilot allows a driver using Autosteer to preset values such as speed. Based on these inputs and real-time sensor data, the vehicle automatically maneuvers in traffic by controlling braking, throttle, and steering. This rule-based decision-making across electronic control units corresponds to a rules engine technology. Additionally, and as a non-limiting example, vehicles with Autopilot and Full Self-Driving (Supervised) infringe claim 4 because, on information and belief, the vehicles are configured to move based on GPS data, map data, and sensor data when they, for example, provide services such as Summon that enable the vehicle to navigate to its destination using GPS and map data while continuously monitoring its surroundings through analysis of sensor input. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 7 because, on information and

[11] https://www.tesla.com/support/full-self-driving-computer

belief, the movement plan is determined at least in part based on use of artificial intelligence operations on the data from one or more sensors.[12] Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 10 because the set of application services comprises a range service such as Autosteer and traffic-aware cruise control and claim 11 because the set of application services comprises a navigation course service when it uses data from sensors to provide lane centering and cruise control guidance. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 21 because they use a brake mechanism controlled based on data consisting of data received from at least one optical sensor when, on information and belief, they use a front camera (i.e., an optical sensor) to determine the distance of the vehicle in front of them.

51. Further, at least since being served with this Complaint, Tesla has indirectly infringed and continues to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21 of the ’877 Patent. Tesla actively induces infringement of the ’877 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, Tesla knowingly induces its customers to use vehicles that it knows or should know infringe one or more claims of the ’877 Patent. Tesla instructs its customers to use vehicles containing the patented invention and specifically intends for those customers to infringe one or more claims of the ’877 Patent by using vehicles containing infringing technology such as Tesla Autopilot and Full Self-Driving (Supervised). Among other inducement actions, Tesla’s instructional, marketing, and sales materials inform customers about the use of Tesla Autopilot and Full Self-Driving (Supervised) and tout the advantages of using Tesla Autopilot and Full Self-Driving (Supervised).

---

[12] https://www.tesla.com/AI

52. Tesla's acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from Tesla the damages they have sustained as a result of Tesla's wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '877 Patent, together with interests and costs as fixed by the Court.

53. Tesla has had notice of the '877 Patent at least as of the date of this Complaint.

54. At all times since the '877 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner. For example, since the '877 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Perrone Robotics, Inc. Company Confidential. Copyright 2025. All rights reserved. TONY and MAX are patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251, 11,782,442, 12,181,877) and Canada (2643378). TONY and MAX have additional patents pending. MAX, Perrone Robotics, TONY, and "Mobility of People and Things" are registered trademarks of Perrone Robotics.

**<u>COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 11,782,442</u>**

55. Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

56. On October 10, 2023, the United States Patent and Trademark Office duly and legally issued the '442 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '442 Patent is attached as Exhibit B.

57. The '442 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

58. Perrone Robotics owns all rights, title, and interest in and to the '442 Patent, including the right to assert all causes of action under the '442 Patent and the right to any remedies for the infringement of the '442 Patent.

59. The ’442 Patent is generally directed to a novel autonomous vehicle which includes a GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

60. Tesla has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’442 Patent, including at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 18, 19, and 20, in violation of 35 U.S.C. § 271(a) by its manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include Tesla Autopilot. Tesla has also directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the ’442 Patent that are identified in the prior sentence when it performs the methods by testing and using its own infringing vehicles, including but not limited to vehicles that include Tesla Autopilot. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the ’442 Patent literally or under the doctrine of equivalents.

61. For example, claim 8 of the ’442 Patent recites:

> 8. An autonomous vehicle comprising:
>
> a vehicle having a steering mechanism, a brake, and a throttle;
>
> a general purpose robotics operating system comprising a set of application services configured to manage at least one of synchronous, asynchronous, or real time application threads, wherein the set of application services is independent of an underlying hardware platform and is configurable to perform at least one of communication tasks and operational tasks;
>
> a steering servomechanism configured to control the steering mechanism based on a movement plan;
>
> a brake servomechanism configured to control the brake based on the movement plan; and
>
> a throttle servomechanism configured to control the throttle based on the movement plan.

62. By way of a non-limiting example, Tesla has infringed claim 8 of the '442 Patent with Tesla vehicles such as the Tesla Model Y that use Tesla Autopilot. Until Tesla unveiled its more affordable Model Y in late 2025, all Tesla Model Ys included Tesla Autopilot.

63. Tesla's vehicles such as the Tesla Model Y comprise autonomous vehicles, as required by claim 8. By way of example, Tesla Autopilot provides autonomous vehicle functions in vehicles such as the Tesla Model Y.

64. Autonomous vehicles such as the Tesla Model Y have a steering mechanism, a brake, and a throttle, as required by claim 8. By way of example, Autosteer relies on a steering mechanism to keep the vehicle centered in the lane. Tesla's traffic-aware cruise control relies on a brake and throttle to increase or decrease speed.

65. Autonomous vehicles such as the Tesla Model Y are equipped with a GPROS comprising a set of application services, as required by claim 8. On information and belief, vehicles with Autopilot have relied on an in-house GPROS, including one called Tesla OS.

66. Vehicles with Tesla Autopilot practice a set of application services configured to manage at least one of synchronous, asynchronous, or real time application threads, as required by claim 8. On information and belief, vehicles with Tesla Autopilot have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with Tesla Autopilot receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

67. Vehicles with Tesla Autopilot practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, as required by claim 8. By way of example, Tesla

Autopilot is independent of the underlying platform and can be used across Tesla models, including the Tesla Model Y. Vehicles with Tesla Autopilot perform operational tasks, including traffic-aware cruise control and Autosteer. Vehicles with Tesla Autopilot perform communication tasks such as communication with the sensors and over-the-air software updates.

68. Vehicles with Tesla Autopilot practice a steering servomechanism configured to control the steering mechanism based on a movement plan, a brake servomechanism configured to control the brake based on the movement plan, and a throttle servomechanism configured to control the throttle based on the movement plan, as required by claim 8. By way of example, Autosteer relies on a steering mechanism to keep the vehicle centered in the lane. Tesla's traffic-aware cruise control relies on a brake and throttle servomechanism to increase or decrease speed.

69. For the reasons discussed above as well as throughout in the context of other patent claims, Tesla's vehicles with Tesla Autopilot also infringe claims 1, 2, 3, 4, 5, 6, 7, 9, 11, 12, 13, 15, 16, 17, 18, 19, and 20. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claims 2, 3, and 4, because on information and belief the steering servomechanism, the brake servomechanism, and the throttle servomechanism are connected to the vehicle by at least one of a fastening system, an adhesive, or a weld. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 7 because vehicles with Tesla Autopilot have maneuver generic services that comprise one or more of a traffic sign handling service, a platooning service, a sudden obstacle avoidance service, a curb avoidance service, a speed bump handling service, a floating obstacle avoidance service, a gated obstacle avoidance service; or a negative obstacle avoidance service, including when they engage in obstacle avoidance through traffic-aware cruise control. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot and Full Self-Driving (Supervised) infringe claim 13 because the

movement plan comprises a route for the autonomous vehicle to traverse, such as when the Summon feature is used or when a lane change is executed. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 15 because vehicles with Tesla Autopilot are configured to transport goods or passengers. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claims 17 and 18 because vehicles with Tesla Autopilot include trucks such as the CyberTruck and units of a group of autonomous vehicles such as specific Tesla vehicles within a model line with Tesla Autopilot.

70. Further, at least since being served with this Complaint, Tesla has indirectly infringed and continues to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 18, 19, and 20 of the ’442 Patent. Tesla actively induces infringement of the ’442 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, Tesla knowingly induces its customers to use vehicles that it knows or should know infringe one or more claims of the ’442 Patent. Tesla instructs its customers to use vehicles containing the patented invention and specifically intends for those customers to infringe one or more claims of the ’442 Patent by using vehicles containing infringing technology such as Tesla Autopilot and Full Self-Driving (Supervised). Among other inducement actions, Tesla’s instructional, marketing, and sales materials inform customers about the use of Tesla Autopilot and Full Self-Driving (Supervised) and tout the advantages of using Tesla Autopilot and Full Self-Driving (Supervised).

71. Tesla’s acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from Tesla the damages they have sustained as a result of Tesla’s wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the ’442 Patent, together with interests and costs as fixed by the Court.

72. Tesla has had notice of the ’442 Patent at least as of the date of this Complaint.

73. At all times since the ’442 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner. For example, since the ’442 Patent’s issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Perrone Robotics, Inc. Copyright 2024. All rights reserved. TONY and MAX are patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251, 11,782,442) and Canada (2643378). TONY and MAX have additional patents pending. MAX, Perrone Robotics, TONY, and Mobility of People and Things are registered trademarks of Perrone Robotics.

**<u>COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 11,314,251</u>**

74. Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

75. On April 26, 2022, the United States Patent and Trademark Office duly and legally issued the ’251 Patent titled “General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions” to Perrone Robotics, Inc. A copy of the ’251 Patent is attached as Exhibit C.

76. The ’251 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

77. Perrone Robotics owns all rights, title, and interest in and to the ’251 Patent, including the right to assert all causes of action under the ’251 Patent and the right to any remedies for the infringement of the ’251 Patent.

78. The ’251 Patent is generally directed to a novel autonomous vehicle which includes a GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

79. Tesla has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’251 Patent, including at least claims 1, 2,

3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, in violation of 35 U.S.C. § 271(a) by its manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include Tesla Autopilot. Tesla has also directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '251 Patent that are identified in the prior sentence when it performs the methods by testing and using its own infringing vehicles, including but not limited to vehicles that include Tesla Autopilot. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the claims of the '251 Patent literally or under the doctrine of equivalents.

80. For example, claim 2 of the '251 Patent recites:

> 2. An autonomous vehicle comprising:
>
> a vehicle having a steering mechanism, a brake, and a throttle, wherein the vehicle is equipped with a general purpose robotics operating system comprising a set of application services, wherein the set of application services comprises a service to manage synchronous, asynchronous, and real time application threads, wherein the application services are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, and wherein the set of application services
>
> > (i) is configurable using a configuration service,
> >
> > (ii) is configurable to be adapted both statically and dynamically, and
> >
> > (iii) is configurable to access configuration data using a generic abstraction;
>
> a steering servomechanism connected to the vehicle and configured to control the steering mechanism based on a movement plan;
>
> a brake servomechanism connected to the vehicle and configured to apply and release the brake based on the movement plan; and
>
> a throttle servomechanism connected to the vehicle and configured to increase and decrease the throttle based on the movement plan.

81. By way of a non-limiting example, Tesla has infringed claim 2 of the '251 Patent with Tesla vehicles such as the Tesla Model Y that use Tesla Autopilot. Until Tesla unveiled its more affordable Model Y in late 2025, all Tesla Model Ys included Tesla Autopilot.

82. Tesla's vehicles such as the Tesla Model Y comprise autonomous vehicles, as required by claim 2. By way of example, Tesla Autopilot provides autonomous vehicle functions in vehicles such as the Tesla Model Y.

83. Autonomous vehicles such as the Model Y have a steering mechanism, a brake, and a throttle, as required by claim 2. By way of example, Autosteer relies on a steering mechanism to keep the vehicle centered in the lane. Tesla's traffic-aware cruise control relies on a brake and throttle to increase or decrease speed.

84. Autonomous vehicles such as the Tesla Model Y are equipped with a GPROS comprising a set of application services, as required by claim 2. On information and belief, vehicles with Autopilot have relied on an in-house GPROS, including one called Tesla OS.

85. Vehicles with Tesla Autopilot practice a set of application services that comprises a service to manage synchronous, asynchronous, and real-time application threads, as required by claim 2. On information and belief, vehicles with Tesla Autopilot have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with Tesla Autopilot receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

86. Vehicles with Tesla Autopilot practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, as required by claim 2. By way of example, Tesla Autopilot is independent of the underlying platform and can be used across Tesla models, including the Tesla Model Y. Vehicles with Tesla Autopilot perform operational tasks, including

traffic-aware cruise control and Autosteer. Vehicles with Tesla Autopilot perform communication tasks such as communication with the sensors and over-the-air software updates.

87. Vehicles with Tesla Autopilot practice a set of application services that is configurable using a configuration service, configurable to be adapted both statically and dynamically, and configurable to access configuration data using a generic abstraction, as required by claim 2. By way of example, Tesla Autopilot allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. Tesla Autopilot calibration is performed both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

88. Vehicles with Tesla Autopilot practice a steering servomechanism connected to the vehicle and configured to control the steering mechanism based on a movement plan, a brake servomechanism connected to the vehicle and configured to apply and release the brake based on the movement plan, and a throttle servomechanism connected to the vehicle and configured to increase and decrease the throttle based on the movement plan, as required by claim 2. By way of example, Autosteer relies on a steering servomechanism to keep the vehicle centered in the lane. Tesla's traffic-aware cruise control relies on a brake and throttle servomechanism to increase or decrease speed.

89. For the reasons discussed above as well as throughout in the context of other patent claims, the Tesla's vehicles with Tesla Autopilot also infringe claims 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19.

90. Further, at least since being served with this Complaint, Tesla has indirectly infringed and continues to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the ’251 Patent. Tesla actively induces infringement of the ’251 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, Tesla knowingly induces its customers to use vehicles that it knows or should know infringe one or more claims of the ’251 Patent. Tesla instructs its customers to use vehicles containing the patented invention and specifically intends for those customers to infringe one or more claims of the ’251 Patent by using vehicles containing infringing technology such as Tesla Autopilot and Full Self-Driving (Supervised). Among other inducement actions, Tesla’s instructional, marketing, and sales materials inform customers about the use of Tesla Autopilot and Full Self-Driving (Supervised) and tout the advantages of using Tesla Autopilot and Full Self-Driving (Supervised).

91. Tesla’s acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from Tesla the damages they have sustained as a result of Tesla’s wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the ’251 Patent, together with interests and costs as fixed by the Court.

92. Tesla has had notice of the ’251 Patent at least as of the date of this Complaint.

93. At all times since the ’251 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software’s info file.

94. Likewise, since the ’251 Patent’s issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Copyright 2022. Perrone Robotics, Inc. All rights reserved. MAX is patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251). MAX is patent pending internationally. MAX, Perrone Robotics, & TONY are trademarks of Perrone Robotics.

**COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 9,833,901**

95. Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

96. On December 5, 2017, the United States Patent and Trademark Office duly and legally issued the '901 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '901 Patent is attached as Exhibit D.

97. The '901 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

98. Perrone Robotics owns all rights, title, and interest in and to the '901 Patent, including the right to assert all causes of action under the '901 Patent and the right to any remedies for the infringement of the '901 Patent.

99. The '901 Patent is generally directed to a novel GPROS which enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

100. Tesla has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, all claims (1–20) of the '901 Patent, in violation of 35 U.S.C. § 271(a) by its manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include Tesla Autopilot. Tesla has also directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '901 Patent that are identified in the prior sentence when it performs the methods by testing

and using its own infringing vehicles, including but not limited to vehicles that include Tesla Autopilot. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the claims of the ’901 Patent literally or under the doctrine of equivalents.

101. For example, claim 1 of the ’901 Patent recites:

> 1. A method
>
> in a general purpose robotics operating system (GPROS) comprising a set of application services, executed using a computing device comprising a processor, the method comprising:
>
> managing synchronous, asynchronous, and real time application threads using at least one of the application services; and
>
> managing at least one of an autonomous vehicle service and an autonomous movement planning service using at least one of the application services,
>
> wherein the set of application services:
>
> > (i) is configurable using a configuration service,
> >
> > (ii) is configurable to be adapted both statically and dynamically, and
> >
> > (iii) is configurable to access configuration data using a generic abstraction, and
>
> wherein the application services are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks.

102. By way of a non-limiting example, Tesla has infringed claim 1 of the ’901 Patent with Tesla vehicles such as the Tesla Model Y that use Tesla Autopilot. Until Tesla unveiled its more affordable Model Y in late 2025, all Tesla Model Ys included Tesla Autopilot. Tesla performs the method identified in claim 1 of the ’901 Patent and in the other infringed method claims of the ’901 Patent identified above when it tests and uses its own infringing vehicles, including vehicles such as the Tesla Model Y that use Tesla Autopilot.

103. Vehicles with Tesla Autopilot practice a method in a GPROS comprising a set of application services, executed using a computing device comprising a processor, as required by

claim 1. On information and belief, vehicles with Autopilot have relied on an in-house GPROS, including one called Tesla OS. Tesla Autopilot is executed by using a computing device (*e.g.*, an Electronic Control Unit or ECU) that comprises a processor (*e.g.*, microcontrollers and microprocessors).

104. Vehicles with Tesla Autopilot practice managing synchronous, asynchronous, and real time application threads using at least one of the application services, as required by claim 1. On information and belief, vehicles with Tesla Autopilot have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with Tesla Autopilot receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

105. Vehicles with Tesla Autopilot practice managing at least one of an autonomous vehicle service and an autonomous movement planning service using at least one of the application services, as required by claim 1. By way of example, vehicles with Tesla Autopilot use an autonomous movement planning service when they use Autosteer to move the steering wheel to keep the vehicle centered in a lane based on a movement plan.

106. Vehicles with Tesla Autopilot have a set of application services that are configurable using a configuration service, are configurable to be adapted both statically and dynamically, and are configurable to access configuration data using a generic abstraction, as required by claim 1. By way of example, Tesla Autopilot allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the

sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

107. Vehicles with Tesla Autopilot practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communications tasks and operational tasks. By way of example, Tesla Autopilot is independent of the underlying platform and can be used across Tesla models, including the Tesla Model Y. Vehicles with Tesla Autopilot perform operational tasks, including traffic-aware cruise control and Autosteer. Vehicles with Tesla Autopilot perform communication tasks such as communication with the sensors and over-the-air software updates.

108. For the reasons discussed above as well as throughout in the context of other patent claims, Tesla's vehicles with Tesla Autopilot also infringe claims 2–20. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 2 because the set of application services comprises a system service which allows one system to execute or trigger one or more other systems, based on at least one of: a trigger, and one or more parameterized conditions based on condition evaluations. For example, vehicles with Tesla Autopilot execute or trigger certain ADAS applications based on triggers or conditions arising from multiple sensors. The concepts set forth in claim 2 were not well-understood, routine, or conventional at the time of the '233 Patent in the field of robotics and automation. The elements of claim 2, separately and in combination with other claim elements, helped solve the problem that existed in the prior art that to create a robot or automated device, a manufacturer had to create hardware and software for the specific device by facilitating configurability and use of multiple sensors.

109. Further, at least since being served with this Complaint, Tesla has indirectly infringed and continues to indirectly infringe all claims (1–20) of the '901 Patent. Tesla actively induces infringement of the '901 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, Tesla knowingly induces its customers to use vehicles that it knows or should know infringe one or more claims of the '901 Patent. Tesla instructs its customers to use vehicles containing the patented invention and specifically intends for those customers to infringe one or more claims of the '901 Patent by using vehicles containing infringing technology such as Tesla Autopilot and Full Self-Driving (Supervised). Among other inducement actions, Tesla's instructional, marketing, and sales materials inform customers about the use of Tesla Autopilot and Full Self-Driving (Supervised) and tout the advantages of using Tesla Autopilot and Full Self-Driving (Supervised).

110. Tesla's acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from Tesla the damages they have sustained as a result of Tesla's wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '901 Patent, together with interests and costs as fixed by the Court.

111. Tesla has had notice of the '901 Patent at least as of the date of this Complaint.

112. At all times since the '901 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software's info file.

113. Likewise, since the '901 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

© 2018 Perrone Robotics. All rights reserved. Perrone Robotics and MAX are registered trademarks of Perrone Robotics, Inc. MAX is patented in the U.S. (9,195,233, 9,833,901). MAX is patent pending internationally. AVTS, the DAK, and TRV are patent pending.

**COUNT 5 – INFRINGEMENT OF U.S. PATENT NO. 9,195,233**

114. Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

115. On November 24, 2015, the United States Patent and Trademark Office duly and legally issued the ’233 Patent titled “General Purpose Robotics Operating System” to Perrone Robotics, Inc. A true and correct copy of the ’233 Patent is attached as Exhibit E.

116. The ’233 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

117. Perrone Robotics owns all rights, title, and interest in and to the ’233 Patent, including the right to assert all causes of action under the ’233 Patent and the right to any remedies for the infringement of the ’233 Patent.

118. The ’233 Patent is generally directed to a novel GPROS, which enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

119. Tesla has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’233 Patent, including at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27, in violation of 35 U.S.C. § 271(a) by its manufacture, use, sale, importation and/or offer for sale of Infringing Products, including vehicles that include Tesla Autopilot. Tesla has also directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the ’233 patent that are identified in the prior sentence when it performs the methods by testing and using its own

infringing vehicles, including but not limited to vehicles that include Tesla Autopilot. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the ’233 Patent literally or under the doctrine of equivalents.

120. For example, claim 1 of the ’233 Patent recites:

> 1. A non-transitory medium encoding a general purpose robotics operating system, an automation operating system, or both a general purpose robotics operating systems and an automation operating system (GPROS), wherein the GPROS comprises:
>
> a set of application services, the set of application services comprising at least one of robotics application services, automation application services, or both robotics and automation application services,
>
> wherein the set of application services (i) is completely configurable by using a config service, (ii) can be adapted both statically and dynamically, and (iii) provides access to configuration data using a generic abstraction,
>
> wherein the set of application services are independent of an underlying hardware platform and allow for combinations of communication, operational, or both communication and operational conduct for communication, operational, or both communication and operational tasks, and
>
> wherein the set of application services comprises (1) a peripheral service, and (2) a sensor service, an actuator service, or both a sensor service and an actuator service, and wherein
>
> the set of application services comprises a service to manage synchronous, asynchronous, and real time application threads

121. By way of a non-limiting example, Tesla has infringed the ’233 Patent with Tesla vehicles such as the Tesla Model Y that have Tesla Autopilot. Until Tesla unveiled its more affordable Model Y in late 2025, all Tesla Model Ys included Tesla Autopilot.

122. Vehicles with Tesla Autopilot practice a non-transitory medium encoding a GPROS, an automation operating system, or both a GPROS and an automation operating system, as required by claim 1. On information and belief, Vehicles with Autopilot have relied on an in-house GPROS, including one called Tesla OS.

123. Vehicles with Tesla Autopilot practice a set of application services, the set of application services comprising at least one of robotics application services, automation application services, or both robotics and automation application services, as required by claim 1. By way of example, vehicles with Tesla Autopilot practice a set of automation application services such as traffic-aware cruise control and Autosteer.

124. Vehicles with Tesla Autopilot practice a set of applications that is completely configurable by using a config service, can be adapted both statically and dynamically, and provides access to configuration data using a generic abstraction, as required by claim 1. By way of example, Tesla Autopilot allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

125. Vehicles with Tesla Autopilot practice a set of application services that are independent of an underlying hardware platform and allow for combinations of communication, operational, or both communication and operational conduct for communication, operational, or both communication and operational tasks, as required by claim 1. By way of example, Tesla Autopilot is independent of the underlying platform and can be used across Tesla models, including the Tesla Model Y. Vehicles with Tesla Autopilot perform operational tasks, including traffic-aware cruise control and Autosteer. Vehicles with Tesla Autopilot perform communication tasks such as communication with the sensors and over-the-air software updates.

126. Vehicles with Tesla Autopilot practice a set of application services comprising a peripheral service, and a sensor service, an actuator service, or both a sensor service and an actuator service, as required by claim 1. By way of example, vehicles with Tesla Autopilot perform a peripheral service such as the instrument cluster display, and they also perform peripheral services when they perform actuator and sensor services. For instance, when automatic braking detects a potential risk of collision, it provides a visual alert on the display. Vehicles with Tesla Autopilot perform a sensor service such as using cameras to detect the lane lines for Autosteer. Vehicles with Tesla Autopilot perform an actuator service, such as a throttle control to decelerate or accelerate the vehicle in traffic-aware cruise control.

127. Vehicles with Tesla Autopilot practice a set of application services that comprises a service to manage synchronous, asynchronous, and real time application threads, as required by claim 1. On information and belief, vehicles with Tesla Autopilot have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with Tesla Autopilot receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

128. For the reasons discussed above as well as throughout in the context of other patent claims, Tesla's vehicles with Tesla Autopilot also infringe claims 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27 of the '233 Patent. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 13 because the hardware retains the software indefinitely because, for example, the hardware, e.g. ROM, permanently stores the Autopilot software. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 14 because vehicles with Tesla Autopilot include hardware which is a computer hard drive.

Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claim 15 because the hardware retains the software ephemerally, including by for example having the hardware (e.g., RAM) load the operating system temporarily while running the system. Additionally, and as a non-limiting example, vehicles with Tesla Autopilot infringe claims 23 and 24 because the software is capable of being updated or otherwise modified before, during, and after fabrication of the device and the device is capable of learning by way of updates or modification of the software, including through over-the-air updates. The concepts set forth in claims 13, 14, 15, 23, and 24 were not well-understood, routine, or conventional at the time of the '233 Patent in the field of robotics and automation. The elements of claims 13, 14, 15, 23, and 24, separately and in combination with other claim elements in the '233 Patent, helped solve the problem that existed in the prior art that to create a robot or automated device, a manufacturer had to create hardware and software for the specific device. These elements of claims 13, 14, 15, 23, and 24, separately and in combination with other claim elements in the '233 Patent, facilitated configurability, including through use of software that is capable of being updated and modified before, during and after fabrication.

129. Further, since at least the fall of 2017 Tesla has willfully infringed and continues to willfully infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27 of the '233 Patent. In the fall of 2017, around October 27, Perrone Robotics, Inc.'s Chief Legal Officer Michael I. Raschid sent a letter to Todd A. Maron, Tesla's General Counsel, in which he offered Tesla the opportunity to bid on a potential acquisition of the '233 Patent and its continuations and foreign counterpart applications. Raschid provided a presentation about the patent. Instead of licensing the patented invention from Perrone Robotics or purchasing the patents, Tesla decided to intentionally infringe the '233 Patent. Despite knowing that Perrone Robotics had

patented this technology, Tesla set out to rely on the technology in their vehicles, including those vehicles that have had Tesla Autopilot. By making, using, selling, importing, and/or offering for sale vehicles that they knew infringed one or more claims of the ’233 Patent, Tesla intentionally and deliberately infringed the ’233 Patent, and is liable for willful infringement.

130. Further, at least since being served with this Complaint and on information and belief at times after the fall 2017 letter discussed above, Tesla has indirectly infringed and continues to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27 of the ’233 Patent. Tesla actively induces infringement of the ’233 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, Tesla knowingly induces its customers to use vehicles that it knows or should know infringe one or more claims of the ’233 Patent. Tesla instructs its customers to use vehicles containing the patented invention, and specifically intends for those customers to infringe one or more claims of the ’233 Patent by using vehicles containing infringing technology such as Tesla Autopilot and Full Self-Driving (Supervised). Among other inducement actions, Tesla’s instructional, marketing, and sales materials inform customers about the use of Tesla Autopilot and Full Self-Driving (Supervised) and tout the advantages of using Tesla Autopilot and Full Self-Driving (Supervised).

131. Tesla’s acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from Tesla the damages they have sustained as a result of Tesla’s wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the ’233 Patent, together with interests and costs as fixed by the Court.

132. Tesla has had notice of the ’233 Patent at least as of the date of this Complaint and on information and belief since the fall of 2017 when it received the letter from Raschid.

133. At all times since the ’233 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software’s info file.

134. Likewise, since the ’233 Patent’s issuance, Perrone Robotics, Inc. has included on its website a patent mark:

> © 2015 Perrone Robotics. All rights reserved. Perrone Robotics and MAX are registered trademarks of Perrone Robotics, Inc. MAX is patented in the U.S. (Patent No. 9,195,233). MAX is patent pending internationally. AVTS, the DAK, and TRV are patent pending.

## JURY DEMAND

135. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC demand a trial by jury on all issues.

## FEES AND COSTS

136. To the extent that the Court finds that Tesla’s willful and deliberate infringement or litigation conduct supports a finding that this is an “exceptional case,” an award of attorneys’ fees and costs to Perrone Robotics is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

Plaintiffs Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC request entry of judgment in their favor and against Tesla as follows:

a. Declaring that Tesla has infringed the Patents-in-Suit, contributed to the infringement of the Patents-in-Suit, and/or induced the infringement of the Patents-in-Suit;

b. Awarding Perrone Robotics damages arising out of this infringement of the Patents-in-Suit, including enhanced damages pursuant to 35 U.S.C. § 284, and prejudgment and post-judgment interest, in an amount according to proof;

c. Awarding Perrone Robotics attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

d. Awarding Perrone Robotics such other costs and further relief as the Court may deem just and proper.

Date: November 24, 2025

Respectfully submitted,

*<u>/s/ Tara R. Zurawski</u>*
Tara R. Zurawski (VA 73602)
BUNSOW De MORY LLP
277 S. Washington St.
Suite 210, #1088
Alexandria, VA 22314
Phone: (415) 426-4729
Fax: (415) 426-4744
tzurawski@bdiplaw.com

Shawn Blackburn (TX 24089989) *PHV forthcoming*
Sy Polky (TX 24102365) *PHV forthcoming*
Hunter Vance (TX 24102596) *PHV forthcoming*
Larry Liu (TX 24133399) *PHV forthcoming*
Whitney Wester (TX 24080420) *PHV forthcoming*
SUSMAN GODFREY L.L.P.
1000 Louisiana
Suite 5100
Houston, TX 77002
Phone: (713) 651-9366
Fax: (713) 654-6666
sblackburn@susmangodfrey.com
spolky@susmangodfrey.com
hvance@susmangodfrey.com
lliu@susmangodfrey.com
wwester@susmangodfrey.com

Sarah Pike (CA 337690) *PHV forthcoming*
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax: (310) 789-3150
spike@susmangodfrey.com